**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-cr-00142-APG-DJA |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| KEVIN SHAWN STUBBS, | |
| Defendant. | |

Presently before the Court is Defendant Kevin Stubbs' Motion to Suppress Evidence Obtained Directly or Indirectly from the Government's Illegal Seizure and Search of his Cell Phone, filed on March 13, 2020. (ECF No. 77). The Government filed a Response on March 27, 2020. (ECF No. 78). Stubbs filed a Reply on April 3, 2020 (ECF No. 79). The Court conducted an evidentiary hearing on June 12, 2020. (Mins. of Proceedings (ECF No. 86)). At the hearing, the Government called two witnesses and offered four exhibits that were admitted. Stubbs also called two witnesses who testified regarding the alleged search. At the conclusion of the hearing, the Court indicated it would file a written Report and Recommendation and took the matter under advisement. This Report and Recommendation follows.

**I.    BACKGROUND**

Stubbs is charged in a one count Superseding Indictment filed on July 31, 2019 with Felon in Possession of a Firearm in violation of Title 18 U.S.C. §§922(g)(1) and 924(a)(2). The charge resulted from law enforcement efforts to locate and arrest Stubbs for state charges, including Assault with a Deadly Weapon, Carry Concealed Weapon/Firearm, and Prohibited Person Possession of a Firearm. After Stubbs was located, law enforcement found a Glock pistol in the passenger side of a vehicle, from which Stubbs ran when law enforcement attempted to arrest him.

1    During the course of attempting to locate Stubbs, officers sought and obtained a pen

2    register/trap and trace for Stubbs' telephone.  Using information obtained from this pen register,

3    law enforcement identified a second phone number they believed was possibly related to the first

4    phone number and Stubbs.  Officers sought and obtained a second pen register, and included,

5    among other information, the statement that the second phone number was obtained after a search

6    of Stubbs' phone which had been left at a residence.

7    Based upon this, Stubbs filed a motion to suppress all of the evidence seized after the

8    illegal search of his phone, including the gun which was found at the time of his arrest nearly one

9    week after the alleged search of the first phone, as fruits of the poisonous tree.  (ECF No. 77).

10   The Government opposed the motion arguing that the phone was never illegally searched.  (ECF

11   No. 78).  Alternatively, it argued that even if it was, the information supposedly seized and used

12   was available from an independent source.  As such, the Government contends that none of the

13   evidence obtained from Stubbs' arrest five (5) days after the purported search of the phone

14   qualifies as fruits of the poisonous tree.  Stubbs replied that there is nothing in the affidavit for the

15   second pen register indicating that the information was received from an alternate source.  (ECF

16   No. 79).  Stubbs further argued that there was not an independent untainted source for this

17   information and that clearly evidence seized at the time of Stubbs' arrest was directly related to

18   the fruit of the poisonous tree and therefore should be suppressed.  Finally, he argues that the

19   Government did not provide any evidence to support their claim that the phone was not searched

20   so an evidentiary hearing was required.

21   The Ninth Circuit has held that a district court must hold an evidentiary hearing if the

22   moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court

23   to conclude that relief must be granted if the facts alleged are proved.  *See United States v.*

24   *Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (citing *United States v. Walczak*, 783 F.2d 852, 857

25   (9th Cir. 1986)); *see also United States v. Irwin*, 613 F.2d 1182, 1187 (9th Cir. 1980); *United*

26   *States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972).  The court need not hold a hearing on a

27   defendant's pre-trial motion "merely because a defendant wants one.  Rather, the defendant must

28   demonstrate that a significant disputed factual issue exists such that a hearing is required."

*Howell*, 231 F.3d at 621 (internal citation omitted).  The determination of whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.  *See United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir. 1979).

The Court considered the parties' factual dispute set forth in the briefing regarding where the second phone number was obtained and whether or not officers reviewed Stubbs' phone in violation of the first pen register order.  The Court found an evidentiary hearing was necessary to resolve the factual dispute regarding the attempted location of Stubbs, the circumstances regarding the information in the affidavit requesting the pen register for the second phone, and whether or not law enforcement ever seized and searched the phone at issue in the first pen register request in violation of that order.  The evidentiary hearing resolved those issues to the Court's satisfaction and the Court will now set forth its findings.

## II.    TESTIMONY AND EVIDENCE

### A.  Government's Witnesses

The Government called two Las Vegas Metropolitan Police Department (LVMPD) officers assigned to the team tasked with locating and arresting Stubbs.  First, Officer Blake Ferron testified that he has been with the department for five (5) years (just under four (4) years at the time of the search in question).  He was assigned to a Flex team which dealt with narcotics crimes and fugitives.  Officer Ferron was contacted by other officers to assist in locating Stubbs who was wanted for various state crimes.  Additionally, Officer Ferron testified that he obtained a phone number (Phone No. 1) associated with Stubbs and confirmed through Clark County Detention Center (CCDC) phone records[1] that the number was tied to a phone being used by Stubbs.  Then, he prepared a request for a search warrant and order for a pen register/trap and trace with real time position for Phone No. 1.  When that was approved, Officer Ferron explained that the warrant is given to the service provider who then provides real time emails from the cellular phone to the requesting officer indicating the location of the phone and call data,

---

[1] Officer Ferron testified that telephone calls from inmates at CCDC are recorded and inmates and recipients of calls are notified of same.  Officer Ferron listened to the calls from the relevant numbers and confirmed the caller using the number was "Kevin."

1   including what numbers call the phone, the duration of the phone call, and where the phone was
2   located during those calls.

3         Further, Officer Ferron testified that this information is received by the officers requesting
4   it via email real time as the phone calls occur.  The location notification occurs approximately
5   every fifteen (15) minutes, again received via email.  Officer Ferron also testified that those
6   emails are generally deleted shortly after they are received because they are simply too
7   voluminous and will fill up his inbox, especially when conducting multiple investigations.
8   Officer Ferron further testified that the information he receives in the emails are kept in an
9   activity report, which serves as a log keeping the date, time, duration, call type, direction and
10  contact identification of every call that is provided to him in an email.  (Government's Exhibit C).

11        Officer Ferron testified that by using this information, he was able to determine that Phone
12  No. 1 was in the vicinity of the 100 block of South Martin Luther King Drive where a Siegle
13  Suites Apartment building was located.  Further investigation revealed that Stubbs' mother
14  resided at that location.  Officer Ferron testified that on March 29, 2019 he went to the front
15  office of the apartment complex and confirmed that Stubbs' mother still lived there.  Then, he
16  arranged surveillance to watch the unit where Stubbs' mother lived to determine whether or not
17  Stubbs was present.  Officer Ferron testified that, while he was there, he talked with management
18  for the apartment complex, went to an apartment similar to the one Stubbs' mother rented so he
19  could see the layout of the apartment for a potential search of it, and thereafter simply provided
20  additional surveillance while other officers conducted further investigation.

21        Subsequently, Officer Ferron testified that, at some stage, Stubbs' mother exited her
22  apartment to take out the garbage.  Other officers approached her, contacted her and asked if
23  Stubbs was in her residence.  They were told Stubbs was not there.  Officer Ferron testified that
24  other officers then entered the apartment and confirmed that Stubbs was not present.  Officer
25  Ferron testified that officers were in the apartment for less than ten (10) minutes as confirmed by
26  Government's Exhibit B.  Officer Ferron testified that he never entered the apartment, he never
27  searched the apartment, and he had no contact with any of the residents for the apartment.  He
28  also testified that he was not looking for a phone and none of the other officers were looking for a

phone when they went in.  Indeed, Officer Ferron testified that he did not need Stubbs' Phone No. 1 because he had the information from it as a result of the pen register/trap and trace warrant that he had previously received.

Officer Ferron further testified that, while he was at the apartment complex, he had his computer with him and was monitoring the pen register from Phone No. 1 in real time.  He explained his reasoning for doing so was because friends or family may contact fugitives and notify them that law enforcement is at a location where they might be so that the fugitives can take evasive action.  While monitoring the pen register, Officer Ferron testified that a specific number made a few contacts within a short period of time.  Officer Ferron testified that action on Phone No. 1's pen register made him think that perhaps that specific number was contacting a phone utilized by Stubbs.  Officer Ferron testified that he identified this second phone number as one of interest (Phone No. 2).

Officer Ferron testified that he tried to confirm that Phone No. 2 might be related to Stubbs, so he ran it through the phone system at CCDC and again confirmed that an individual utilizing that number was referred to as Kevin.  Officer Ferron then sought a second search warrant and order for pen register/trap and trace with real time position location warrant for Phone No. 2.  In that affidavit, Officer Ferron stated that while making contact at the address where Stubbs' mother lived, it was determined that Stubbs had left the phone at the residence. Officer Ferron stated in his affidavit that he observed Phone No. 2 make three (3) contacts to Phone No. 1, clearly implying that he received that information from reviewing Stubbs' phone, presumably in violation of the search warrant order for that phone.  (See Exhibit D).  After the second search warrant was approved, Officer Ferron testified that they began monitoring Phone No. 2.  As a result of the location information from Phone No. 2, officers were able to locate Stubbs on April 9, 2019.

Officer Ferron testified that after conducting surveillance for approximately two (2) hours, officers attempted to arrest Stubbs.  Officer Ferron testified that Stubbs and another individual attempted to escape in the vehicle in which Stubbs was riding as a passenger and that it crashed during the attempt to flee.  After the crash, Stubbs ran and was eventually taken into custody.

1    Officers located a weapon in the passenger side of the vehicle from which Stubbs fled.  Officer

2    Ferron testified that he did not ever look at Stubbs' phone, he never received any data or

3    information specifically from the phone, and the basis for his knowledge of the second number

4    was the information being sent to his email address real time as a result of the first pen register.

5        The Court also heard testimony from Detective Richard Hart, an eighteen (18) year

6    veteran of the Las Vegas Metropolitan Police Department who has been assigned to the Major

7    Violators Unit for the previous ten (10) years.  Hart testified that he was also asked to assist in

8    locating and arresting Stubbs.  Hart testified that he received the same real time email information

9    from the search warrant that Officer Ferron had obtained from Phone No. 1.  Detective Hart also

10   testified that this information led them to believe that Stubbs might be located at the Siegle Suites

11   on Martin Luther King Boulevard.

12       Detective Hart confirmed that investigation revealed Stubbs' mother lived at the Siegle

13   Suites, and authorities therefore set up surveillance in an attempt to locate Stubbs at that location.

14   Detective Hart confirmed that a number of detectives and officers were there on the surveillance

15   squad and that he too was receiving real time information from the pen register.  Detective Hart

16   confirmed that the information is received in emails, the emails are routinely destroyed shortly

17   thereafter, but the information is maintained in logs that were admitted into evidence as Exhibit

18   C.  Detective Hart confirmed Officer Ferron's testimony regarding their respective duties, and

19   that Officer Ferron continued the surveillance after his initial investigation.

20       Detective Hart testified that during the surveillance, a woman exited the apartment

21   thought to be where Stubbs' mother lived.  Detective Hart testified that he approached the woman

22   and confirmed that she was Stubbs' mother.  He and other officers asked her to confirm whether

23   or not Stubbs was there and she indicated he was not.  Detective Hart indicated that he was one of

24   the officers who went into the apartment to search for Stubbs.  He indicated that they were only

25   looking for Stubbs and did not find him.  He further testified that they were not looking for a cell

26   phone and he never recalled seeing a cell phone.  Detective Hart testified that he was not aware of

27   anyone finding a cell phone and did not believe anyone found anything of evidentiary value

28   inside the apartment.  Detective Hart confirmed that the information regarding Phone No. 2 was

obtained from the real time information received from the previous pen register request and not from Stubbs' phone.

**B. Stubbs' Witnesses**

Stubbs called two witnesses, Lori Winsor and Nonnie Midgette.  They were in a relationship at the time and residing at the Siegle Suite apartment in question.  Winsor testified that she is Stubbs' mother, but that he was not living with her at the time police searched her apartment.  Winsor confirmed that she was confronted by police when she took out garbage.  She indicated that she was questioned after they showed her their identification.  Winsor testified that she was not allowed to go into her apartment until after officers told her she could go back in. She estimated it was approximately forty-five (45) minutes.  She testified that she did not give authorization for anyone to go into the apartment or for anyone to search the apartment.  She further testified that when she went back to the apartment, it looked a little different because a storage closet where Stubbs kept property was left with the door open and property falling out. However, she never testified that Stubbs kept a phone there or that a phone was missing.

Midgette testified via video conference that he was living with Winsor at the Siegle Suite Apartments on the day in question.  Midgette testified that he received a telephone call from the police who told him to go outside.  Midgette testified he complied and went outside but saw no police.  He indicated that when he walked downstairs he heard a call and realized it was the police calling him.  They motioned him to their location and took him behind a building.  Midgette testified police indicated they were looking for Stubbs and he replied that "Kevin doesn't live here."  Midgette testified that no one ever asked about going upstairs or to go into the apartment. Midgette testified that he did not know that police had even entered the apartment until well after the incident.  Midgette further testified that he did not notice anything out of the ordinary when he went into the apartment after they left, which is why he assumed that they had not gone into the apartment.

**C. Exhibits**

The Court admitted into evidence, without objection, the following:

- Government's Exhibit A: the warrant and order for a pen register/trap and trace with real time position location for Phone No. 1;

- Government's Exhibit B: the Las Vegas Metropolitan Police Department Communication Center Event Log outlining the investigation at the apartment of Stubbs' mother;

- Government's Exhibit C: the Report of Activity from the information received from the search warrant from Phone No. 1; and

- Government's Exhibit D: the search warrant and order and related documents for the pen register and trap and trace with real time position location for Phone No. 2.

Stubbs provided no exhibits.

## III.  LEGAL STANDARD AND ANALYSIS

### A.  Fourth Amendment

The Fourth Amendment addresses "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. It protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 353 (1967). More specifically, the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also United States v. Wetselaar*, 2013 WL 8206582, at *10 (D. Nev. Dec. 31, 2013), report and recommendation adopted, 2014 WL 1366722 (D. Nev. Apr. 7, 2014).

The Fourth Amendment and its progeny is only triggered if and when law enforcement conducts a search or seizure. Thus, if the Court determines that law enforcement did not conduct a search or seizure of Stubbs' phone in order to obtain the second telephone number and thereafter locate Stubbs, then any Fourth Amendment inquiry is finished. Here, after considering the testimony and evidence presented at the evidentiary hearing, the Court finds unequivocally, that law enforcement did not search Stubbs' phone and the reference to same in the affidavit for

the second pen register was simply an error made by the younger officer who prepared and swore out the affidavit for the second search warrant.

Stubbs does not contest the initial pen register request or the lawfulness of it as to Phone No. 1. Indeed, the Court can see no basis to contest the probable cause for that warrant. Moreover, the testimony was uncontroverted at the hearing that Exhibit C contained the real time information that the officers were receiving as a result of that pen register. Thus, any information that they may have received by searching Stubbs' phone was already provided to them in real time as a result of the first pen register. Accordingly, the Court finds the officers' testimony to be credible there was absolutely no need to search Stubbs' phone.

In addition, considering the evidence and testimony at the hearing, the Court is convinced that they did not search the phone. Officer Ferron testified that he proceeded to the Siegel Suite Apartments, met with management, reviewed another apartment for preparation of the search, and thereafter participated in surveillance. Officer Ferron testified and Detective Hart confirmed that he never went into the apartment with the other officers. Stubbs' witnesses did not contradict this testimony. Thus, there is absolutely no evidence to support that Officer Ferron entered the apartment or otherwise saw or seized a phone.

This finding is also confirmed by Stubbs' witnesses. Both witnesses confirmed that Stubbs was not at the apartment on the day in question and had not been staying there. While Stubbs' mother testified that a closet in which he stored property appeared to have been opened and disturbed, she never mentioned a phone and never testified that Stubbs kept a phone at the apartment. Moreover, Midgette testified that he did not see anything disturbed at all in the apartment and did not know anyone had entered it during the period the police were there. His testimony is notably silent regarding a cellular phone. So, the Court is convinced that Stubbs' phone was not at the apartment at the time in question and therefore, could not have been searched by law enforcement.

Accordingly, the Court agrees with the Government that Stubbs' phone was never searched by Officer Ferron. It further agrees that the inclusion of the sentence in the affidavit for the search warrant for Phone No. 2 (Exhibit D) that Stubbs "had left a phone at the residence"

was simply a mistake made by Officer Ferron.  The next sentence, while inartfully drafted, states

that during the contact he observed the second phone number make three contacts with Stubbs'

phone.  The officer could have clarified that information came from the first pen register

information it provided, but this failure to clarify does not support the inference that the

information was obtained as a result of the search of the phone.  Likewise, mistakenly saying a

phone was left at the residence does not otherwise invalidate the warrant because even without

that sentence there is ample probable cause for the warrant.  *See, e.g., United States v. Gibson*,

2017 WL 1401477, at *4 (D. Nev. Jan. 11, 2017) ("The effect of misrepresentations and

omissions on the existence of probable cause is considered cumulatively.").

The Court also agrees with the Government that given that no search of the phone

occurred, the Fourth Amendment inquiry ends.  As such, the Court need not reach a decision on

whether or not the gun found at the time of Stubbs' arrest is a fruit of the poisonous tree or

whether the officers could have obtained the information from an independent source.  Given that

no search of the phone occurred, the Court declines to analyze those issues as unnecessary.

## IV.    CONCLUSION AND RECOMMENDATION

In conclusion, because the Court finds that no search of Stubbs' phone occurred and that

the reference to finding a phone at the residence in the affidavit was simply an inaccurate

statement, the Court will recommend that Stubbs' motion to suppress any evidence seized at the

time of his arrest as fruits of the poisonous tree be denied.

**IT IS THEREFORE RECOMMENDED** that Defendant Stubbs' Motion to Suppress

Evidence (ECF No. 77) be **denied**.

## V.    NOTICE

This report and recommendation is submitted to the United States District Judge assigned

to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation

may file a written objection supported by points and authorities within fourteen days of being

served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely

*/ / /*

1    objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d

2    1153, 1157 (9th Cir. 1991).

3          DATED: June 25, 2020

4

5    _____
    DANIEL J. ALBREGTS

6        UNITED STATES MAGISTRATE JUDGE